CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

**4/14/2023**

LAURA A. AUSTIN, CLERK
BY:  s/ ARLENE LITTLE
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA LYNCHBURG DIVISION

| | | |
|---|---|---|
| AMANDA BAKER, | ) | |
| | ) | Civil Case No.: **6:23CV00021** _____ |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| CARRIAGE HILL RETIREMENT, LLC | ) | |
| | ) | |
| **SERVE**: R/A: Incorporating Services, Ltd. | ) | |
|      7288 Hanover Green Dr. | ) | |
|      Mechanicsville, VA, 23111-0000 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| TJM PROPERTIES, INC. | ) | |
| *d/b/a/* THE PRINCESS MARTHA, | ) | |
| | ) | |
| **SERVE**: R/A: Terence J. McCarthy | ) | |
|      5801 Ulmerton Road, Suite 200 | ) | |
|      Clearwater, FL 33760 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| JANE DOE | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

1.     Amanda Baker ("Ms. Baker" or "Plaintiff"), by and through undersigned counsel, brings this action against Defendants Carriage Hill Retirement, LLC ("Defendant Carriage Hill") and TJM Properties, Inc. ("Defendant TJM") (collectively, "TJM Defendants") for violating Plaintiff's rights under the Employee Retirement Income Security Act, 29 U.S.C. 18 § 1001 et seq. ("ERISA"), violating her rights under Title I of the Americans with Disabilities Act of 1990 ("ADA") and the Pregnancy Discrimination Act of 1978 ("PDA") (which amended Title VII of the Civil Rights Act of 1964), and retaliating against her when she reported rampant and shocking

abuse and neglect of Carriage Hill residents to state investigators in violation of Virginia's whistleblower statute: Va. Code Ann. § 40.1-27.3, and Virginia common law and against TJM Defendants and Jane Doe for damaging Plaintiff's property while she was acting within the scope of her employment.

## I.    INTRODUCTION

2.    This case involves sex-based discrimination and retaliation against whistleblower-plaintiff, Amanda Baker in addition to ERISA violations and damage done to Plaintiff's car. Plaintiff has evidence that TJM Defendants, through their authorized agents: (1) discriminated against Ms. Baker on the basis of sex (pregnancy); (2) terminated her on the pretext of refusing to accommodate her requested accommodation under the ADA when TJM Defendants confirmed Plaintiff had reported resident abuse and neglect to state authorities; (3) failed to pay her premiums for health insurance and other benefits despite deducting employee contributions from her paychecks; and (4) damaged Plaintiff's property while acting within the scope of their employment.

## II.    JURISDICTION AND VENUE

3.    This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. Code § 2000e et seq. ("Title VII"), the Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 et seq. ("VHRA"), Virginia's whistleblower statute: Va. Code Ann. § 40.1-27.3, the Employee Retirement Income Security Act, 29 U.S.C. 18 § 1001 et seq. ("ERISA"), and the common law of Virginia (Bowman claim).

4.    This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§ 216(b) and 1451(c), 42 U.S.C. §§ 2000e-5(f), and 28 U.S.C. §§ 1331 and 1345.

5.      This Court has supplemental subject matter jurisdiction over the claims arising under Virginia state law because they are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C.§ 1367(a).

6.      Venue lies in the Western District of Virginia, Roanoke Division, under 42 U.S.C. § 2000e-5(f) (3) because the unlawful employment practices documented in this Complaint occurred within the Commonwealth of Virginia.

## III.   PARTIES

7.      Plaintiff, **Amanda Baker**, worked for Carriage Hill Retirement, LLC as the Sales & Marketing Director for Carriage Hill's facility in Bedford, Virginia between July 19, 2021, and May 31, 2022.

8.      Between January-May 2202, Ms. Baker made several detailed reports to state officials detailing shocking, systemic abuse and neglect of Carriage Hill residents.

9.      On May 31, 2022, TJM Defendants terminated Ms. Baker **less than two hours** after she confirmed that she was the whistleblower who had been providing information to state officials.

10.     **Carriage Hill Retirement, LLC** (Defendant Carriage Hill) is a Florida limited liability company that owns and operates Carriage Hill Retirement Community, a nursing home in Bedford, Virginia.

11.     Carriage Hill Retirement Community serves vulnerable, elderly residents, including memory care patients.

12.     Carriage Hill's headquarters is located at 420 Bay Ave., Clearwater, FL, 33756.

13.     Carriage Hill is a subsidiary of TJM Properties, Inc.

14.    **TJM Properties, Inc.** "is a real estate acquisition and management firm specializing in hotels and senior living…. TJM [currently] owns and manages its four senior living and ten hotels." (**Exhibit 1**.)

15.    Defendant TJM acquired Carriage Hill Retirement Community in 2009. (**Exhibit 2**.) Defendant Carriage Hill and Defendant TJM were Plaintiff's joint employers during the period in which she worked at Carriage Hill.

16.    Defendant TJM's headquarters is located at 5801 Ulmerton Rd., Suite 200, Clearwater, FL 33760.

17.    TJM Properties, Inc. does not appear to have registered to do business in the Commonwealth of Virginia despite operating and managing Carriage Hill Retirement Community in Bedford, Virginia.

## IV.    EXHAUSTION OF REMEDIES

18.    On or about May 31, 2022, Ms. Baker was terminated from her position as Sales & Marketing Director, allegedly because she could not return to work in person three days earlier than her doctor had released her to do so while recovering from conditions related to pregnancy.

19.    On or about September 9, 2022, Plaintiff filed a Charge (**Exhibit 3**) with the Equal Employment Opportunity Commission ("EEOC") alleging pregnancy-based discrimination, interference, and retaliation in violation of the ADA as amended by the Pregnancy Discrimination Act of 1978.[1]

---

[1] None of the other causes of action contained in this Complaint required administrative exhaustion prior to filing suit.

20.     Plaintiff specifically asked the EEOC to dual file her Charge "with the Virginia Council on Human Rights and that the charge be investigated by both agencies and any other federal or state agencies which may have jurisdiction." (**Exhibit 3**, at 6.)

21.     After 180 days passed without any evidence the EEOC was close to completing its investigation, Plaintiff asked the EEOC to issue a Notice of Right to Sue.

22.     On March 29, 2023, the EEOC issued an unsigned Notice of Right to Sue (**Exhibit 4**; "the 1st Notice") giving Plaintiff 90 days to file suit against TJM Defendants on the basis of the claims alleged in her Charge.

23.     At Plaintiff's request, the EEOC issued another Notice of Right to Sue (**Exhibit 5;** "the 2nd Notice") that <u>was</u> signed by Director Calhoun.

24.     Plaintiff now brings this Complaint within the time period permitted to do so.

## V.      LEGAL FRAMEWORK

- **<u>Virginia's Whistleblower Statute, Va. Code Ann. § 40.1-27.3</u>**

25.     Under Va. Code Ann. § 40.1-27.3, "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee: [o]r a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor … [or] [r]efuses to engage in a criminal act that would subject the employee to criminal liability."

26.     Under Va. Code § 40.1-27.3(C), "A person who alleges a violation of this section may bring a civil action in a court of competent jurisdiction within one year of the employer's prohibited retaliatory action.

27.     The court may order as a remedy to the employee (i) an injunction to restrain continued violation of this section, (ii) the reinstatement of the employee to the same position held before the retaliatory action or to an equivalent position, and (iii) compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs.

- **<u>Bowman Claim</u>**

28.     In Virginia, the at-will employment doctrine is not absolute. One exception is the "public policy exception," commonly referred to as a "Bowman claim."

29.     An at-will employee asserting a wrongful discharge claim must identify a Virginia statute establishing a public policy that was violated by the employer. <u>Warner v. Buck Creek Nursery, Inc.,</u> 149 F. Supp. 2d 246, 261 (W.D. Va. 2001).

30.     The employee must show that the statute either statute explicitly states that it expresses a public policy of Virginia or that it is designed to protect the property rights, personal freedoms, health, safety, or welfare of the public and the employer violated that public policy and wrongfully discharged the employee for performing a duty under that statute or for refusing to engage in its violation. <u>Anderson v. ITT Indus. Corp.</u>, 92 F. Supp. 2d 516, 520 (E.D. Va. 2000) (emphasis added).

31.     The discharged employee must also show that he or she is within the class of persons the statute is designed to protect.  This may be accomplished by showing that the employee has a duty under the statute.

32.     Furthermore, a person need not be a victim of the statutory violation to fall within the statute's protective reach.  Rather, in Virginia, it is well settled that a statute's protective reach

extends "beyond the class of persons who are victims of its violation [and] may extend to those who have a legal duty under that statute." Id. at 521 (emphasis added).

33.    In Virginia, terminating an employee for refusing to engage in a criminal act is a textbook Bowman claim. Anderson v. ITT Indus. Corp., 92 F. Supp. 2d 516 (E.D. Va. 2000).

34.    Employees may recover compensatory damages for successful Bowman claims.

- **Employee Retirement Income Security Act ("ERISA")**

35.    Under ERISA, Plan fiduciaries are personally liable for all losses a Plan beneficiary incurs as a result of any "breach[ of] any of the responsibilities, obligations, or duties imposed upon fiduciaries …." Hammer v. Johnson Senior Ctr., Inc., 2020 U.S. Dist. LEXIS 223169, *12-13 (W.D. Va. 2020).

36.    Plan fiduciaries are those named in the Plan documents and all persons who exercise authority or discretion with respect to the management or disposition of Plan assets or any "discretionary authority or discretionary responsibility in the administration of such plan," including the corporate employer and its agents.  Id. at *13-14.

37.    The corporate employer is a Plan fiduciary because it is responsible for remitting employee contributions to the Plan and has the power to remove any Plan administrator who is not performing that task as required.  Id. at *24.

38.    ERISA fiduciaries owe duties of loyalty and care to Plan beneficiaries.  Id. "These fiduciary obligations are the highest known to the law."  Id.

39.    Money deducted from employees' paychecks designated to pay Plan premiums are Plan assets under ERISA.  Id. at *25 (quoting 29 C.F.R. § 2510.3-102(a)).

40.    Plan fiduciaries who fail to remit Plan assets "violate[] their fiduciary duties of loyalty and care under 29 U.S.C. § 1104(a)."  Id. at *27-28.

- **Title I of the Americans with Disabilities Act of 1990 ("ADA")**

41.    Under the ADA, employers with 15 or more employees are required to grant reasonable accommodation requests from disabled employees provided that granting the requested accommodation would not produce an undue burden on the employer.  42 U.S.C. § 12112(b)(5).

42.    Under Sec. 12102(1)(A), a person is considered "disabled" if she has "a physical or mental impairment that substantially limits one or more major life activities of such individual."

43.    Self-care, walking, standing, lifting, and working are considered "major life activities" under the ADA.  42 U.S.C. § 12102(2)(A).

44.    The definition of "disability" is to be construed broadly, to the maximum extent permitted under the ADA.  42 U.S.C. § 12102 (4)(A).

45.    Examples of reasonable accommodations include "part-time or modified work schedules."  42 U.S.C. § 12111(9)(B).

46.    When determining if a requested accommodation would produce an "undue hardship," producing "significant difficulty or expense," the court should consider "the nature and cost of the accommodation" and "the impact otherwise of such an accommodation upon the operation of the facility."  42 U.S.C. § 12102(10).

47.    Remote work is a reasonable accommodation, particularly in instances in which the employer has previously allowed the employee to work remotely.  Graffius v. Shinseki, 672 F. Supp. 2d 119, 128 (D. D.C. 2009).

- **Title VII, as amended by the Pregnancy Discrimination Act of 1978 ("PDA")**

48.    The Pregnancy Discrimination Act of 1978 ("PDA") amended Title VII to clarify that pregnancy-based discrimination is discrimination "on the basis of sex."

49.     Under the PDA, employers may not discriminate against employees because of a medical condition related to pregnancy and must treat such employees the same as others who are similar in their ability or inability to work but are not affected by pregnancy, childbirth, or related medical conditions.

- **The Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 et seq.**

50.     Under Va. Code Ann. § 2.2-3905, "[i]t is an unlawful discriminatory practice for [a]n employer to [f]ail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to such individual's compensation, terms, conditions, or privileges of employment because of such individual's ... pregnancy, childbirth or related medical conditions …."

- **Negligence – _Respondeat Superior_**

51.     Employers are derivatively liable for the negligent acts of their employees acting within the course of their employment.

## VI.    STATEMENT OF FACTS

52.     On July 19, 2021, Plaintiff began working at Carriage Hill's Bedford, Virginia site.

53.     Plaintiff became pregnant shortly after accepting this position.

54.     She worked under the supervision of Executive Director, Olaoluwa Apata ("Ola" or "Mr. Apata").

55.     Unlike nurses, whose physical presence is required to provide care to the residents, Plaintiff (who is not a nurse) performed nearly all of her job duties remotely.

56.     These duties included: online marketing of the facility to attract new residents, networking, sales, phone calls, and building relationships with other healthcare facilities in the Roanoke, Bedford, and Lynchburg area.

57.    From July 2021, Plaintiff sometimes worked at the facility but performed most tasks virtually from home or off-site, i.e., by visiting Centra, Carilion, Virginia Baptist, or other medical health care facilities.

### A.    **Plaintiff observes shocking abuse and neglect of residents while providing care and reports those violations to her supervisor and VDSS inspectors.**

58.    While Plaintiff was rarely on-site at the Bedford facility, she was <u>required</u> to come to the facility on Christmas Eve 2022 and <u>care for residents</u> because Defendants did not have enough Certified Nursing Assistants ("CNAs") to adequately meet their needs.

59.    Plaintiff is not and has never been a CNA and had <u>no training</u> to care for residents in this capacity.

60.    Plaintiff objected to being forced to provide care for residents but complied with Defendants' demand out of fear she would lose her job if she refused.

61.    While caring for residents on Christmas Eve 2022, Plaintiff observed numerous significant violations that concerned her.

62.    Over the next few weeks, Plaintiff began observing other violations at the facility that concerned her greatly.

63.    After unsuccessfully trying to voice concerns about patient care directly to her supervisor, Mr. Apata, Plaintiff reported them to the Virginia Department of Social Services ("VDSS").

64.    Plaintiff made her first report to VDSS on or around January 26, 2022.

65.    On that occasion, Plaintiff was on the phone with the VDSS investigator for over two hours detailing the resident abuse and neglect she personally witnessed.

66.    Plaintiff told the VDSS investigator that patients were being intentionally left in soiled conditions for prolonged periods of time.

67.     Specifically, Plaintiff reported: patients left soaked in urine for days without being cleaned, patients "living in pee," mattresses drenched to such extent that when you lifted the mattress "the urine literally poured out," (see, e.g., **Exhibit 6**,) nurses refusing to provide care, patients left soiled for days at a time, and patients whose skin and clothing were left covered in feces because the nurses were too disgusted to change the patient.

68.     VDSS cited TJM Defendants for multiple violations, many of which resulted from Plaintiff's reports.

69.     The violations were so numerous and extreme that after failing its state inspection in early 2022, Carriage Hill was given a "provisional license" that was set to expire on June 30, 2022.

70.     From February 2022 through May 2022, Plaintiff made several more reports of criminal offenses to VDSS, including reports of abuse, neglect, mishandling of patient funds, and fraud.

71.     Plaintiff worked directly with the Licensing Inspector charged with investigating the facility.

**B.  TJM Defendants order Plaintiff to destroy evidence to obstruct investigations.**

72.     Desperate to retain its operating license, TJM Defendants attempted to sweep violations under the rug to avoid further citations.

73.     Mr. Apata repeatedly attempted to obstruct VDSS's investigation into illegal conduct committed by TJM Defendants.

74.     In early March 2022, two VDSS investigators asked Plaintiff to come to the VDSS office to meet with the investigators, Mr. Apata, and Defendants' corporate representatives.

75.    In response, Mr. Apata ordered Plaintiff to "destroy all evidence" that could get Carriage Hill in trouble with the state.

76.    This included but was not limited to: 1) the complaints and pictures Plaintiff gave to Mr. Apata complaining about the facility's mishandling of controlled narcotics; 2) evidence of resident abuse and neglect; 3) evidence of mishandling of resident funds; and 4) evidence of the facility's misclassification of patients' eligibility for memory care and government grants.

77.    Mr. Apata expressly ordered Plaintiff "not to talk to state investigators" and ordered her not to provide any evidence or information to VDSS.

78.    Mr. Apata forced Plaintiff to show him her phone to prove she had deleted all photos of resident abuse and neglect.

79.    Plaintiff complied with Mr. Apata's request and showed him she had deleted all such photos from her phone.

80.    What Mr. Apata did not know is that Plaintiff had screen-shotted those same photos and saved them to her computer and had already provided many of them to VDSS officials.

81.    Plaintiff also complied with Mr. Apata's demand she not go to the VDSS office but provided the additional information to VDSS investigators over the telephone instead.

**C.  TJM Defendants violate ERISA by failing to remit employee contributions deducted from her paychecks.**

82.    TJM Defendants also failed to properly register Plaintiff for short-term disability benefits (despite deducting the premiums from her paychecks), amplifying her stress even more just before she was scheduled to give birth.

83.    To make matters worse, on a day when Plaintiff was at the Bedford facility, a co-worker (Jane Doe), acting within the course of employment, rammed a golf-cart into Plaintiff's

parked car, causing thousands of dollars in damage (for which TJM Defendants refused to reimburse her).

**D.  <u>TJM Defendants violate the ADA and Title VII by refusing to allow Plaintiff to work remotely as she did prior to becoming pregnant.</u>**

84.    The enormous stress produced by having to be physically present on-site with the individuals whose actions she was reporting to VDSS in real time, even occasionally, caused significant complications with Plaintiff's pregnancy.

85.    On April 5, 2022, Plaintiff's doctor, Dr. Christopher Keeley ("Dr. Keeley"), wrote her a note ("Note 1"; **Exhibit 7**) indicating Plaintiff was "36 weeks pregnant," was experiencing "fluctuations in blood pressure," and limited her to perform only "light duty work from home."

86.    Plaintiff provided Note 1 to Mr. Apata and asked TJM Defendants to accommodate her request to work from home to allow her to continue working while coping with this pregnancy-induced disability.

87.    Despite having allowed Plaintiff to work primarily from home for most of the time she had worked for TJM Defendants, TJM Defendants refused to approve the requested accommodation.  TJM Defendants did not seek any additional information from Plaintiff or Plaintiff's medical provider before rejecting Plaintiff's request for an accommodation, nor did they ask Plaintiff to be evaluated by a medical provider of their choice.

88.    On April 8, 2022, Dr. Keeley wrote a second doctor note ("Note 2"; **Exhibit 8**) taking Plaintiff out of work entirely to remove her from the traumatic environment at work, noting that work "worsen[ed]" her "elevations in blood pressures."

89.    When Plaintiff presented Note 2 to her employer, **Carriage Hill's agent**, Andrea <u>Von Blomberg (the Regional HR Specialist for TJM Properties, Inc.)</u>, **called Plaintiff's doctor's**

**office and demanded that Dr. Keeley remove the language in Note 2 stating work was worsening her blood pressure**.  (See **Exhibit 9**.)

90.    When Dr. Keeley refused, <u>Carriage Hill threatened to contact its legal department about the issue</u>.

91.    Carriage Hill ultimately approved Plaintiff's request for short-term leave on April 11, 2022.

### E.  TJM Defendants violate the ADA and Title VII again by refusing to allow Plaintiff to work remotely for a few days while recovering from giving birth.

92.    Plaintiff went into early labor on April 14, 2022, and gave birth later that day. Plaintiff's child was born three weeks premature and required additional treatment in the hospital to treat conditions produced by early delivery and Plaintiff's high blood pressure.

93.    On Friday, May 27, 2022, Dr. Keeley examined Plaintiff and released her to return to work <u>immediately</u> with the <u>sole restriction</u> that she be permitted to work remotely until she recovered from delivery (estimated to require approximately one week).

94.    Plaintiff immediately notified TJM Defendants of this requested accommodation and asked to return to work.

95.    TJM Defendants refused Plaintiff's request for this accommodation despite having allowed her to work remotely prior to the date Plaintiff notified TJM Defendants she was pregnant.

96.    Instead, <u>TJM Defendants ordered Plaintiff to provide a doctor's note releasing her to work without restrictions</u> no later than May 31, 2022.  That was only two business days after Plaintiff notified TJM Defendants she was ready and willing to work.

97.    When Plaintiff was unable to convince Dr. Keeley to release her to work in-person any earlier than June 6, 2022, Plaintiff contacted her primary care physician (Dr. David Cummins) to see if he would release her any earlier.

98.     On May 31, 2022, Dr. Cummins examined Plaintiff but refused to release her to work in person any earlier than Friday, June 3, 2022.

99.     Plaintiff continued to be able to work remotely until that time.

100.     Plaintiff immediately informed TJM Defendants she was still ready and able to work remotely but that her doctor had not yet released her to work in person.

101.     Plaintiff conveyed Dr. Cummins's prognosis that she could return in person in three days.

102.     Despite this, TJM Defendants refused to accommodate Ms. Baker's request to work remotely for three days until she could return to work in person.

**F.   TJM Defendants are placed on a provisional license due to multiple violations, order employees to stop providing information to Plaintiff.**

103.     On April 21, 2022, while on leave from work, Plaintiff made her final report to VDSS detailing violations she had observed at Carriage Hill, (See **Exhibit 10**.)

104.      As a result of Plaintiff's reports, VDSS inspected Carriage Hill on January 31, February 9, March 18, and April 28, 2022.  VDSS cited TJM Defendants with multiple violations.  (See **Exhibit 11**.)  The violations were so severe VDSS downgraded TJM Defendants' license to a "provisional license" that was set to expire on June 30, 2022.

105.     Following several major citations for violations, TJM Defendants began to suspect that Plaintiff – who had also reported these violations to her supervisor, Mr. Apata – was the whistleblower who had provided VDSS evidence of TJM Defendants' abuse and neglect of residents.

106.     In response, TJM Defendants summoned their employees and held an emergency meeting in which Mr. Apata ordered all employees to stop talking to Ms. Baker and stop providing her with information.

### G. **TJM Defendants terminate Plaintiff hours after she confirms she is the whistleblower who has been providing information to state investigators.**

107.    At 4:41 p.m. on or about May 31, 2022, Plaintiff sent an e-mail (**Exhibit 12**) to Andrea Von Blomberg, the Regional HR Specialist for TJM Properties, Inc. Plaintiff copied Mr. Apata and Melanie Mahone, Carriage Hill's Business Office Manager.

108.    In the e-mail, Plaintiff asked why Carriage Hill refused to accommodate her request to return to work remotely, as she had always done in the past, for just "three more days" until she could get a doctor's note to clear her to return to the facility.

109.    Plaintiff also confirmed that she was the whistleblower who had been providing evidence of TJM Defendants' abuse and neglect of residents to state inspectors and asked whether TJM Defendants' refusal to grant her accommodation request was just a way to retaliate against her for truthfully reporting these violations.

110.    Approximately one hour later, at 6:02 p.m., Plaintiff was terminated via e-mail by Ms. Blomberg, purportedly for being unable to perform her job duties remotely (the very same job duties Ms. Baker had regularly performed remotely as Marketing Director at Carriage Hill) (See **Exhibit 13**.)

## VII.    CAUSES OF ACTION

### COUNT I
### WHISTLEBLOWER RETALIATION
### (Va. Code Ann. § 40.1-27.3)

111.    Plaintiff hereby incorporates by reference paragraphs 1-110 as if fully restated in this Count I.

112.    Under Va. Code § 63.2-1606, Plaintiff had a statutory duty to report suspected "abuse, neglect, or exploitation of adults."

113.    Plaintiff was required by law to preserve and make available all evidence including "any information, records, or reports which document the basis for the report" to the state and adult protective services. Va. Code § 63.2-1606(B).

114.    Destruction of evidence documenting the alleged abuse or neglect is illegal and prohibited by Virginia law.  All evidence must be preserved and made available for investigation by the state.

115.    In compliance with Va. Code § 63.2-1606(A), Plaintiff reported, in good faith, violations of state law to her supervisor and VDSS when she reported the acts of abuse detailed in Paragraphs 66, 67, and 76 of this Complaint.

116.    As a direct and proximate cause of Ms. Baker's good faith efforts to report these acts of abuse, TJM Defendants terminated her employment.

117.    The pretext invented to support Ms. Baker's termination was intended to mask TJM Defendants' retaliatory motive.

118.    Plaintiff lost her job and source of income as a result of opposing TJM Defendants' unlawful conduct.  Plaintiff has suffered approximately $60,000 in lost wages and benefits and will lose additional wages and benefits at a rate of approximately $1,800 per week until she is reinstated to her position as Sales & Marketing Director at Carriage Hill.

119.    Plaintiff has also suffered severe emotional distress and mental anguish as a result of being fired right after giving birth for honestly and bravely reporting abuse of the most vulnerable members of our society.

120.    Under Va. Code Ann. § 40.1-27.3(C), Plaintiff is entitled to injunctive relief, reinstatement, and "compensation for lost wages, benefits, and other remuneration, together with interest thereon, as well as reasonable attorney fees and costs."

**COUNT II**
**BOWMAN CLAIM**
**(Virginia Common Law)**

121.    Plaintiff hereby incorporates by reference paragraphs 1-120 as if fully restated in this Count II.

122.    Va. Code § 63.2-1606 establishes a public policy of Virginia designed to protect the health and safety of the public – specifically, elderly residents.

123.    Under Va. Code § 63.2-1606(A), Plaintiff had a statutory duty to report the violations specified in paragraphs 66, 67, and 76 because she was a mandatory reporter.

124.    Plaintiff reported TJM Defendants' violations of state law to her supervisor and VDSS inspectors.

125.    TJM Defendants retaliated against Plaintiff by terminating her as a direct and proximate result of Plaintiff reporting TJM Defendants' violations of state law.

126.    Under Virginia Common Law, Plaintiff is entitled to compensatory damages, which are still accruing, as well as punitive damages up to $350,000 as a result of TJM Defendants' unlawful termination of her employment.

**COUNT III**
**ERISA VIOLATIONS**
**(29 U.S.C. 18 § 1001 et seq.)**

127.    Plaintiff hereby incorporates by reference paragraphs 1-126 as if fully restated in this Count III.

128.    TJM Defendants are fiduciaries under ERISA because they are the corporate employers who had the power to remove any Plan administrator who is not performing that function in accordance with the ERISA and other applicable law.

129.    Under 29 U.S.C. 18 § 1002(7), ERISA "participants" include "any employee or former employee of an employer … who is or <u>may become eligible</u> to receive a benefit of any type from an employee benefit plan which covers employees of such employer …." (Emphasis added.)

130.    Ms. Baker was a "participant" of the Plan administered by TJM Defendants because she was eligible to receive benefits under that Plan.

131.    Under ERISA, TJM Defendants owe duties of care and loyalty to Ms. Baker as a participant of the Plan they administered.

132.    TJM Defendants breached their duties to Ms. Baker by failing to enroll her in their Plan despite her election to participate and despite deducting employee contributions from her paychecks.

133.    By virtue of the acts described above, TJM Defendants caused Ms. Baker to lose employee benefits she would have received but for their breach.

134.    As a result of being denied benefits under TJM Defendants' Plan, Ms. Baker lost approximately $2,400 in employee benefits that she would have received under the Plan but for TJM Defendants' actions.

135.    Under ERISA, TJM Defendants are liable for all losses Ms. Baker incurred as a result of these actions and Ms. Baker may recover the attorney fees and costs she incurred seeking a remedy for TJM Defendants' violations.

**COUNT IV**
**AMERICANS WITH DISABILITIES ACT ("ADA") VIOLATIONS**
**(42 U.S.C. § 12111 et seq.)**

136.    Plaintiff hereby incorporates by reference paragraphs 1-135 as if fully restated in this Count IV.

137.    Under the ADA, TJM Defendants were forbidden from discriminating against Plaintiff on the basis of her disability.

138.    Plaintiff was disabled within the meaning of the ADA because she had a physical impairment related to her pregnancy that substantially limited one or more major life activities.

139.    Plaintiff asked TJM Defendants to accommodate her disability by allowing her to work remotely, as her doctor ordered and as she had done for long stretches of time while performing this same job for TJM Defendants.

140.    TJM Defendants could have granted Plaintiff's requested accommodation without it imposing an undue burden on TJM Defendants.

141.    TJM Defendants violated the ADA by refusing to grant Plaintiff's reasonable accommodation request.

142.    As a result of TJM Defendants' refusal to grant Plaintiff's requested accommodation, she was unable to work, causing her to lose income and, eventually, her job.

### COUNT V
### TITLE VII/PDA VIOLATIONS
**(42 U.S.C. § 2000e et seq., as modified by the Pregnancy Discrimination Act of 1978)**

143.    Plaintiff hereby incorporates by reference paragraphs 1-142 as if fully restated in this Count V.

144.    Plaintiff was at all times material hereto an employee of TJM Defendants covered by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. Code § 2000e et seq., prohibiting discrimination or harassment on the basis of race.

145.    TJM Defendants are, and at all times material hereto were, employers within the meaning of 42 U.S.C. § 2000e-b and as such waere prohibited from discriminating against Plaintiff on the basis of sex as set forth in 42 U.S.C. § 2000e-2(a).

20

146.    Under the PDA, pregnancy-based discrimination is discrimination on the basis of sex.

147.    Plaintiff was a member of a protected class within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. Code § 2000e et seq. because she is female and was pregnant at the time TJM Defendants discriminated against her.

148.    Under the PDA, "An employer may not discriminate against an employee because of a medical condition related to pregnancy and must treat the employee the same as others who are similar in their ability or inability to work but are not affected by pregnancy, childbirth, or related medical conditions."

149.    TJM Defendants discriminated against Plaintiff on the basis of her sex in violation of Title VII by treating her differently and worse than they treated Plaintiff when she was not pregnant (and worse than other non-pregnant employees) when they rejected Plaintiff's request for a short period of remote work.

150.    Prior to becoming pregnant, TJM Defendants had regularly allowed Plaintiff to work remotely.

151.    Plaintiff's protected status – pregnant – was a motivating factor for this discriminatory conduct.

152.    As a proximate result of TJM Defendants' unlawful treatment of Plaintiff, Plaintiff has suffered lost wages, and mental anguish, all in an amount to be established at the time of trial. Plaintiff will continue to lose wages until she is reinstated to her previous position as Sales & Marketing Director for Carriage Hill's facility in Bedford, Virginia.

153.    Under 42 U.S.C. § 2000e-5, Plaintiff is entitled to recover compensatory damages, punitive damages, attorney fees, costs, and interest.

## COUNT VI
## VHRA VIOLATIONS
### (Va. Code Ann. § 2.2-3900 et seq.)

154.    Plaintiff hereby incorporates by reference paragraphs 1-153 as if fully restated in this Count VI.

155.    Plaintiff was at all times material hereto an employee of TJM Defendants covered by the Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 et seq., prohibiting discrimination or harassment on the basis of sex.

156.    TJM Defendants are, and at all times material hereto were, employers within the meaning of Va. Code Ann. § 2.2-3905 and as such were prohibited from discriminating against Plaintiff on the basis of sex (including pregnancy) as set forth in Va. Code Ann. § 2.2-3905(B).

157.    TJM Defendants violated Va. Code Ann. § 2.2-3905(B) by discriminating against Plaintiff on the basis of sex by treating her worse than Defendants treated non-pregnant employees – including Plaintiff herself before she became pregnant.

158.    Plaintiff's protected status – pregnant – was a motivating factor for this discriminatory conduct.

159.    The cumulative effect of this and other discriminatory acts by TJM Defendants' agents created a hostile work environment for Plaintiff.

160.    As a proximate result of TJM Defendants' unlawful treatment of Plaintiff, Plaintiff has suffered lost wages and mental anguish, all in an amount to be established at the time of trial.

161.    Under Va. Code Ann. § 2.2-3908(B), Plaintiff is entitled to recover compensatory damages, punitive damages, attorney fees, costs, and interest.

<u>COUNT VII</u>
**NEGLIGENCE – *RESPONDEAT SUPERIOR***

162.    Plaintiff hereby incorporates by reference paragraphs 1-161 as if fully restated in this Count VII.

163.    TJM Defendants' agent, Jane Doe, owed a duty to Plaintiff to use ordinary care to operate the golf cart she was driving in a reasonable manner so as not to damage the property of others, including Plaintiff's property.

164.    TJM Defendants' agent breached this duty to Plaintiff by negligently operating the golf cart and striking Plaintiff's car.

165.    TJM Defendants' agent breached this duty while acting within the scope of her employment.  Therefore, TJM Defendants are vicariously liable for these actions of their agent.

166.    As a direct and proximate result of this breach, Plaintiff suffered damage to her vehicle in the amount of $3,500.

167.    Because TJM Defendants are vicariously liable for the actions of their agent, TJM Defendants and Jane Doe are jointly and severally liable for all damages resulting therefrom.

**VIII.    <u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff Amanda Baker requests judgment against TJM Defendants and moves this Court for an Order:

A.  Declaring that TJM Defendants violated Va. Code Ann. § 40.1-27.3 and the common law of Virginia when they terminated her for reporting violations of state law;

B.  Requiring TJM Defendants to reinstate Plaintiff to her previous position as Sales & Marketing Director for TJM Defendants' facility in Bedford, Virginia.

C.  Awarding Plaintiff compensatory damages, which are still accruing, for lost wages and benefits, emotional distress, and mental anguish in the amount to be determined once Plaintiff is reinstated plus $350,000 in punitive damages for her unlawful termination;

D.  Awarding Plaintiff $3,500 in compensatory damages resulting from the damage to her property negligently caused by TJM Defendants' agent;

E.  Awarding Plaintiff $2,400 in compensatory damages resulting from TJM Defendants' failure to remit the employee contributions they deducted from her paychecks;

F.  Awarding Plaintiff her costs and reasonable attorney fees incurred pursuing her claims as provided under the Employee Retirement Income Security Act, 29 U.S.C. 18 § 1001 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. Code § 2000e et seq., the Virginia Human Rights Act, Va. Code Ann. § 2.2-3900 et seq., and Va. Code Ann. § 40.1-27.3.

G.  Awarding Plaintiff pre-judgment and post-judgment interest at the rate specified in the statute giving rise to corresponding damages; and

H.  Providing such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE**

April 14, 2023

Respectfully Submitted,

**AMANDA BAKER**

By: ***/s/ Christopher E. Collins***
Christopher E. Collins

*Counsel for Plaintiff*

Mia Yugo (VSB No. 92975)
Christopher E. Collins (VSB No. 90632)
**YUGO COLLINS, PLLC**
25 Franklin Road, SW
Roanoke, Virginia 24011
Tel: (540) 861-1529
Direct: (540) 855-4791
chris@yugocollins.com
mia@yugocollins.com

*Counsel for Plaintiff*